```
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3     _____
                                     )
 4     YOUT LLC,                     )
                                     ) No. 3:20-cv-01602-SRU
 5                  Plaintiff,       )
                                     ) August 5, 2021
 6     v.                            )
                                     ) 3:58 p.m.
 7                                   )
       RECORDING INDUSTRY           ) 915 Lafayette Boulevard
 8     ASSOCIATION OF AMERICA,       ) Bridgeport, Connecticut
       INC. ET AL.,                  )
 9                                   )
                    Defendants.      )
10     _____)

11

12

13                       MOTION HEARING
                     via Zoom Videoconference

14

15     B E F O R E:

16          THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

17

18     A P P E A R A N C E S:

19     FOR THE PLAINTIFF:

20          MUDD LAW
                 3114 West Irving Park Road, Suite 1
                 Chicago, IL 60618
21               (773) 588-5410
                 E-mail:  clm@muddlaw.com
22          BY:  CHARLES LEE MUDD, JR., ESQ.

23

24

25               Official Court Reporter:
                 Melissa J. Cianciullo, RDR, CRR, CRC
                 Melissa_Cianciullo@ctd.uscourts.gov
```

```
1   A P P E A R A N C E S   C O N T ' D:

2
    FOR THE DEFENDANTS:
3
         MUNGER, TOLLES & OLSON LLP
4             350 South Grand Avenue, 50th Floor
              Los Angeles, CA 90071
5             (213) 683-9240
              E-mail:  rose.ehler@mto.com
6         BY:  ROSE LEDA EHLER, ESQ.

7        WIGGIN AND DANA
              One Century Tower
8             265 Church Street P.O. Box 1832
              New Haven, CT 06510
9             (203) 498-4361
              E-mail:  jcraven@wiggin.com
10        BY:  JAMES O. CRAVEN, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **3:58 p.m.**

2              THE COURT:  Good afternoon.  Do we have

3       everyone?

4              MS. EHLER:  Yes.  Good afternoon, Your Honor.

5       Rose Ehler on behalf of the defendant Recording

6       Industry Association of America.

7              THE COURT:  Thank you.

8              MR. MUDD:  And Charles Mudd on behalf of the

9       plaintiff Yout, LLC.

10             THE COURT:  Thank you.

11             MR. CRAVEN:  Good afternoon, your Honor.  Jim

12      Craven from Wiggin and Dana also on behalf of the

13      defendant.

14             THE COURT:  All right.  Thank you.

15             And we're here on the motion to dismiss.

16      Take it away.  This is an interesting one.  So,

17      Ms. -- is it "Eye-ler"?

18             MS. EHLER:  It's "E-ler."  Any number of

19      vowels could come out of those letters.

20             THE COURT:  Ehler.  All right.  Ms. Ehler, if

21      you would start out, please.

22             MS. EHLER:  Thank you, your Honor.

23             So *Iqbal* and *Twombly* control the pleadings in

24      this case.  And those cases teach us that we're to

25      disregard assertions, legal conclusions, and we

1    actually use judicial experience and common sense to

2    determine whether the allegations amount to a claim

3    for relief.  Here we have declaratory relief,

4    declaratory judgment claims.

5         But I want to focus on one allegation in

6    particular, an admission, really, a concession by the

7    plaintiff in their complaint which establishes the

8    two elements of a circumvention claim.  And I think

9    sufficiently that the Court can dismiss the complaint

10   at this stage.  That's Paragraph 41.

11        And plaintiff describes the way -- at a very

12   high level, not the words I would use, but at a very

13   high level, the way that the Yout software operates.

14   It says that Yout encounters the signature mechanism.

15   That's the rolling cipher.  It then reads and

16   interprets the program.  It derives a signature

17   value.  That's the key.  And then that key enables it

18   to access the digital files, the audio tracks, which

19   are stored elsewhere which are then downloaded, it

20   makes copies of those for the end user.

21        So that paragraph, I think, has enough for

22   the two elements, the effective technological measure

23   and circumvention that are required under Section

24   1201 for a claim.

25        So just briefly going into why I think those

1    allegations establish those elements, an effective

2    technological measure doesn't have to be Fort Knox.

3    We're not talking about, you know, something that

4    keeps everybody, even the toughest hacker in the

5    world, out.  It's gauged by the ordinary user.

6        So if I'm watching YouTube, it's me, right?

7    And how I engage with YouTube is the standard that

8    we're looking at.  And the text of the statute

9    defines a technical measure that's effective, and

10   this I think is important, as just requiring an

11   application of information or a process that's

12   required to gain access to the work.  So some sort of

13   technological hurdle.  It doesn't have to be a

14   particular type of technological hurdle.  It's about

15   the function as being a gating factor between the

16   digital file of the copyrighted work and the person,

17   the user who's engaging with it.

18       So when in Paragraph 41 Yout says that it

19   encounters a signature mechanism, that's enough.

20   It's hitting that technological obstacle.  That's the

21   TPM or the technological measure.  And the fact that

22   it has to read, interpret, derive means that there is

23   something effective there that would stop a normal

24   person from gaining access to that file.

25       So I don't think there's any question here on

1   that.  We've also cited -- I don't think they're

2   necessary, but cited the German decision.  There's

3   since been a UK decisions finding exactly this, that

4   the rolling cipher is effective.

5         Moving briefly to circumvention, here I think

6   it's just a matter of word choice.  Yout uses the

7   words "reads, interprets, derives" to describe what

8   it's doing; but those are just different words for

9   deciphering, decrypting, otherwise getting around,

10  circumventing that technological measure.  And it

11  says it derives a signature value.  That's a key that

12  it then uses to access the file.

13        And I want to go to one of the cases, because

14  I think that's really helpful.

15        THE COURT:  Let me just inquire.  So in terms

16  of circumvention, if the average browser that

17  encounters this TPM is given the key, what does Yout

18  do to circumvent?  In other words, it's everybody

19  gets in free, isn't it?

20        MS. EHLER:  No, your Honor.  And I think the

21  case will be helpful.  But to directly answer your

22  question, just because there's a process that's

23  happening with the YouTube in ordinary course, with

24  the YouTube video player, just because a YouTube

25  video player -- you know, go onto YouTube, my toddler

1    is really into music videos, like guitar videos.

2    Let's say I want to watch Stevie Nicks, Fleetwood

3    Mac.  I type in my song, I get my official music

4    video.  Not every YouTube video is protected by the

5    rolling cipher.  But I get my music video.  What's

6    happening in the back end, what's happening at the,

7    sort of, source code level and the video player is

8    authenticating and being recognized as legitimate,

9    what's happening in the back end is not the same as

10    just, sort of, you know, an open sesame being

11    published on the Internet somewhere.  That is the

12    rolling cipher operating as it's intended to operate.

13         What Yout does is really interposes itself,

14    its code, its software to take the place of the

15    authorized YouTube video player and redirect or, sort

16    of, grab out of where it's stored that file.  We're

17    not watching the YouTube video.  It's being

18    redirected so that Yout enables a copy to be made --

19    from the original, a copy to be made.

20         So, you know, the oversimplification with the

21    way this is described can be misleading.  But this is

22    not an instance -- and let me -- if you'll let me

23    engage with *Corley* and *Reimerdes* for a minute, I

24    think it's helpful to think of the DVD context in

25    CSS.  So CSS is the technology that protects

 1   copyrighted movies as a digital file in DVDs, and

 2   there each of -- each of other DVD players back when

 3   we had those, I think I still have one, had an

 4   program, algorithm built into it with the keys.  And

 5   so the circumvention technology in *Corley* and

 6   *Reimerdes* was called DeCSS.  It was invented or

 7   created by a teenager in Norway who essentially

 8   reverse engineered a DVD player, figured out the

 9   algorithm, figured out the keys and then created a

10   software program.  So instead of your DVD player

11   going in -- or your DVD going into your computer and

12   saying, you know, you can't make a copy, you can only

13   play it, the DVD would go into the computer and DeCSS

14   would let you take the file off of the DVD.  That's

15   the same thing that's happening here.

16        What Yout does is engage with that

17   technological measure to circumvent it, right?  It's

18   using the algorithm, using the keys to gain access

19   without the authorization of the content owners in

20   the exact same way, really functionally the same as

21   DeCSS was with the algorithm and the keys that

22   protected a DVD.  And, you know, we know this because

23   of the result.  We know this because of what happens.

24   Yout -- you can't go on to YouTube and get a copy.

25   There's no download button.  You can't right click

1    and save as in the way that you could right click on

2    an image on an article and save as.  You can't right

3    click and save the song.

4          But Yout -- and this is Paragraph 23, Yout

5    says it enables storing of an MP3 file locally on a

6    computer.  That's the copy.  So the end result is

7    what tells us that, you know, whatever words Yout is

8    using, it's circumventing that technological

9    protection measure.

10          And so just taking one step back, it's not

11   just the technology that Yout is interfering with

12   here.  It's also the economics.  YouTube operates --

13   you have to watch advertisements to watch a YouTube

14   video or pay for the premium service.  That's how

15   YouTube and the record companies are compensated for

16   the music that is being streamed.  And so what Yout

17   is doing is not just -- I mean, there's a purpose to

18   it.  It's taking that value for itself.  Those

19   individuals who are using Yout's service, their

20   copies can become pirated copies that get, you know,

21   streamed in all sorts of places on the Internet; and

22   they're not going to be paying for a digital download

23   or a premium music service.  So it's really

24   interfering on both of these levels.

25          And, again, out of, sort of common sense, you

```
 1   know, experience level, there's just -- there's no
 2   world in which that adds up to a legitimate piece of
 3   software, a software that doesn't do something
 4   technologically that's circumventing, whatever words
 5   it wants to use, it wants to use read, interpret and
 6   derive, that is decrypt, avoid, bypass.  You can't
 7   get around it with creative word choice, and that's
 8   circumvention.
 9          And, you know, just to bring context to this,
10   we cited the international orders, Spain, Italy,
11   Denmark.  Yout actually appeared in Denmark and had
12   an expert and still lost.  There was a criminal
13   investigation in Brazil, to just bring context for
14   what's going on here.
15          I was going to move on to 512(f) if you'll
16   let me, but I'm happy to answer questions on 1201.
17          THE COURT:  Why don't we play ping-pong and
18   hear from both sides on issue by issue.  I think it
19   would help me keep track.
20          Mr. Mudd.
21          MR. MUDD:  Yes, your Honor, and thank you.
22   And it's nice to be back in this court, the District
23   of Connecticut, all be a couple decades later and
24   appearing on a case and particularly a case of such
25   importance.
```

1           And I think a couple quick points I'll

2   respond to very quickly.  The foreign law, that can

3   be distinguished.  Many of the cases, my client

4   wasn't even a defendant there.  It was a third party.

5   The German court related to encryption technology.

6   That's not relevant here.  I'd be happy to brief a

7   response on the foreign court opinions, but I don't

8   think we really need to.

9           And what I want to get across here on the

10  1201 is why doing something on Yout that can be done

11  in our Chrome browser, you and I could do it, cannot

12  violate the Digital Millennium Copyright Act.

13          And *Reimerdes*, the DeCSS, DeCSS, that's not

14  applicable here.  The DeCSS was a code, an encryption

15  code completely different case.  There's really -- as

16  I'll describe, there's no encryption code.  There's

17  really no code that you and I can't go to the

18  browser, the source code of the web page and get.

19          You know, and on that point I had to stop in

20  preparing for this hearing and remind myself that we

21  are on a motion to dismiss, and a lot of what I'm

22  going to say is going to disagree with the

23  defendant's understanding of the technology.  Whether

24  they actually do understand it and are saying

25  something different in their notices or they don't

1    understand it, it seems that there is a question of

2    fact because there is a lot of information battling

3    back and forth on the actual use of the technology

4    and so forth.  And I just kind of drove home to my

5    point that, again, we are on a motion to dismiss.

6         But I believe that to demonstrate today, one

7    of the things that I want to demonstrate today that

8    my client does not violate the MCA, it doesn't -- and

9    I'm clearly prepared to demonstrate this.  But on a

10   motion to dismiss, the burden is on the RAA.  Any

11   questions must be resolved in favor of the plaintiff.

12   And, again, in federal court we're noticed pleading,

13   and we believe that we have sufficiently pled the

14   elements.

15        Now, let's go to talk about the technology

16   that they have discussed here.  And, you know, Yout

17   does nothing more than Google Chrome browser and

18   Google's own YouTube software provides.  She

19   indicated, Ms. Ehler, indicated that YouTube does not

20   provide a download function.  Well, that may be true

21   on its face.  But if you actually go into the source

22   code that I can show you that we each can get access

23   to from many web page for a YouTube video, that

24   source code has secondary URLs for the video

25   streaming and the audio streaming.  If I copy that

1  URL and put it into a web browser, I can actually get

2  the YouTube software, YouTube's page, source code to

3  provide a download button.  So YouTube does provide

4  that capability through its own source code.

5       But when I'm talking about source code, you

6  know, the defendant wants to make this out as some

7  kind of revolving cipher, some secret code.  This

8  source code is not secret code.  It's -- you know, it

9  would be interesting to determine in discovery where

10  the origination of the rolling cipher arose.  But the

11  source code at issue is readable computer code that

12  YouTube makes publicly available and each of our

13  browser reads every time we go to YouTube, and we all

14  can view the source code.  It's not rocket science

15  and it's not hidden behind a wall.

16       But let's take a step back.

17       The recording industry has been focused on or

18  has focused on a small universe of content or works

19  in the video sphere on the Internet.  They're

20  concerned, perhaps, about the videos in which their

21  record company's artists has sound recordings.

22  That's what they're concerned about, the sound

23  recordings in some of the videos on the Internet.

24       There are a lot of private videos, you know,

25  that our kid -- Rose talked about our kids listening

1   to YouTube.  My kids post on YouTube.  There are a

2   number of YouTube videos out there and other video

3   platforms where people are sharing, and Yout provides

4   a service -- in fact, there are users that actually

5   direct people to Yout to copy their own particular

6   content.  And YouTube, as I said, is just one of many

7   platforms.

8        But in that broad sphere of video and video

9   platforms out there, let's eliminate what we're not

10  talking about.  Yout cannot and does not allow access

11  to encrypted content.  Yout cannot and does not allow

12  access to DRM content, digital rights management

13  content.  Yout cannot and does not allow access to

14  content behind a firewall.  And even if I have access

15  to a private video, let's say a YouTube private video

16  that one of my staff members has shared of one of

17  their kids playing volleyball, even if I have access

18  to that private video and I'm logged into my own

19  account, so if I go to YouTube and I play that

20  private video, I can't copy the URL for that video,

21  paste it on Yout and have Yout access to it.  Why?

22  Because it's a private video that requires a username

23  and password to get access to, and Yout's not going

24  to be able to get past that.

25        So what Yout can access are publicly

1    available videos where the material is already

2    accessible to the public.  Whoever has uploaded the

3    content has uploaded it to YouTube, and they've kind

4    of lost control, to a certain extent, of that

5    content.  The person or the entity then that is

6    making that content available is YouTube or Google

7    through the YouTube platform.  And though there are

8    other video platforms, I'm just focusing on YouTube

9    because that seems to be the name of the day.  But

10   the content is already publicly accessible to

11   anybody, so I can watch a Taylor Swift video and play

12   it.

13           But let's look at the statute that's at

14   issue; and let's focus on these two particular points

15   on a technical measure and the circumvention, because

16   there's really two aspects.  The technical measure,

17   just looking at 1201(a)(3)(B) for a moment,

18   effectively controls access to the work if the

19   measure in the ordinary course of its operation

20   requires the application of information, or a process

21   or a treatment, with the authority of the copyright

22   owner to gain access to the work.  Now, of course,

23   the work is already accessible by anybody.  You can

24   go to the YouTube page and access that work.  Clearly

25   you're only seeing one second at a time, but that's

1  the nature of temporal art, right?  We can only watch

2  a movie one second at a time.

3        So let's -- if it already exists, if the

4  content, the copyrighted work already exists, there

5  really can't be at that point a technological measure

6  effectively controlling access because we can access

7  it.  It's on the page.

8        Let's look at circumvention at 838.  To

9  circumvent a technological measure means to

10  descramble a scrambled word, not what we're talking

11  about.  Decrypt an encrypted work, not what we're

12  talking about.  Or otherwise avoid, bypass, remove,

13  deactivate or impair a technological measure without

14  the authority of the copyright owner.  1201(b)(2) is

15  similar and I'll get to that.

16        And even if we're talking about a technical

17  measure, Yout is merely using that same technical

18  measure as every browser does and as any individual

19  could, and so it can't be a violation.  And notably,

20  as indicated in our brief, you know, the statute does

21  not talk about using a technical measure.  It's

22  talking about avoiding, bypass, removing.  So unless

23  the URL -- because really what's happening here is

24  using a URL, or a uniform resource locator, unless

25  the URL constitutes a technological measure, there

1    really is no circumvention.  This becomes clear and

2    knowing more specifically what Yout does.  For a web

3    page with content already publicly accessible, Yout

4    accesses a source code on that web page that, again,

5    happens to be publicly available.  So not only is the

6    content, the YouTube video, but actually the source

7    code is publicly accessible.  And every time we go to

8    that web page, that YouTube page, our browsers on our

9    individual computers are reading that source code and

10   we can look at it.  Some people might be thrilled to

11   look at it, others it's, you know, not so much.  It's

12   not machine code.  It's not zeros and ones and it's

13   not encrypted.  And Yout uses this information to do

14   what anyone can do with a Chrome browser.

15            Let's break it down further.

16            On each particular YouTube page, there's the

17   YouTube URL.  That's the YouTube page URL.  That's

18   the one that if I wanted to send to my friends, go

19   look at this YouTube video, it's great, it's funny,

20   laugh up a storm, that's the YouTube page URL that I

21   would use.  But there is also one or more URLs for

22   the video stream, and there is also one or more URLs

23   for the audio stream.  So what YouTube is doing in

24   the -- behind the scenes through the source code is

25   when I access that particular page, it's creating a

1    temporary URL for the videos to stream and for the

2    audio to stream.  These stream URLs arguably happen

3    to be the rolling cipher, one of the things that

4    happens from time to time.  But it doesn't prevent

5    access to the video.  I'm still watching the video

6    already.

7         But a URL, nonetheless -- and it's certainly

8    not a secret code.  The URL for the page is what

9    consumers or -- as I said, or anyone uses to access

10   the page.  Once there, YouTube feeds their browser

11   the source code for the web page which includes the

12   stream URLs for the visit to that web page, and then

13   we're able to see it on our screen.

14        Now, again, I need to remind everybody that

15   the content is publicly accessible, not only the

16   video, let's say, but the source code.  And being on

17   YouTube, RAA and its member companies no longer

18   control that access.  When they post that video to

19   YouTube as anyone has done, you can choose whether

20   you want it publicly accessible, you can restrict it

21   so that only people with the actual URL for that

22   video can access it, or you can make it private.  And

23   if it's private, then, of course, Yout can't get it.

24        Now, behind the scenes, Yout is using

25   third-party software products to kind of package some

```
1   things.  But what Yout does is it pulls these stream
2   URLs, the video and the audio stream URLs, and puts
3   them together with slight modification to enable a
4   consumer to download a copy of the content.  But
5   Chrome and YouTube itself allows this to occur.  And
6   over the last couple days, I've tested it on multiple
7   computers and multiple browsers, actually, even
8   Firefox allows it.  I can post stream URLs.  I can go
9   into the source code by viewing the source code for a
10  particular YouTube page.  I can get that stream URL.
11  I can post that in a new web page at the top, and I
12  can actually get that video content to show up.  With
13  some slight modifications, I can get the entire -- by
14  just changing one number, I can get the entire video.
15  And YouTube's code, YouTube's own source code
16  provides a download button in the right corner.  In
17  fact, doing it that way, as opposed to Yout, I can do
18  it one better and I can get the actual -- the sound
19  recording separated from the actual video.
20          So I'm able to do that as an individual where
21  we have -- and that's maybe seven straightforward
22  steps to be able to facilitate that.  Yout maybe
23  takes five steps to accomplish the same purpose.
24          And, you know, in preparing your Honor for
25  this hearing, I was trying to think of the best
```

1    analogy.  I was trying to think of the VCR case where

2    you take a videocassette and you put it in and you're

3    recording the radio waves that the rabbit ear

4    antennas used to pull down and convert into analog

5    signal that would then show audio and visual on the

6    tube, on the television, and then a VCR allowed to

7    capture that and put it on acetate tape.

8          Or the boom box where we used to take

9    cassettes, many of us here may remember taking

10    cassettes, putting it into the boom box and being

11    able to record for personal use the sound, the music

12    that's coming across the radio station.  I always had

13    a problem and disliked when the disk jockey would

14    talk over the beginning and the end of the song.

15          But, you know, it came to -- and the one

16    other analogy was there's also Apple's QuickTime

17    player that allows me to do a screen recording and

18    record what's on my screen and the audio the same

19    way.  In fact, the YouTube -- the apple iPhone allows

20    screen recordings.  I could do the same thing.  I

21    could start a screen recording and go and play a

22    YouTube video and have a file.

23          But the best analogy was Google's own

24    software, the Google Chrome browser and YouTube

25    source code that provides the download button.

1    That's all I need, just the browser Chrome and

2    YouTube's own source code and I'm able to do what

3    Yout does.  Yout probably -- my client doesn't want

4    me to say that but it's possible.

5            So before I end on 1201, let's return to the

6    statute.  Technical measure, a technical measure,

7    quote, that -- the statute has part of the wording

8    quoted and, I believe that refers to the upper part

9    of the statute where the same language has been used

10    before.  But a technological measure, quote,

11    effectively controls access to a work, end quote, if

12    the measure in the ordinary course of its operation

13    requires the application of information or process or

14    a treatment with the authority of the copyright owner

15    to gain access to a work.

16            Again, the work is already accessible on

17    YouTube.  I can watch it without anything all the way

18    through.

19            If the streaming URLs are that technical

20    measure, if the streaming URLs are the technical

21    measure that all I have to do is put in another web

22    page and I'm able to get the audio and download that

23    audio on a separate file, they cannot require the

24    application of information or process or treatment.

25    They are the information.  The logical extension of

1  the RAA's argument would mean that any URL, uniform

2  resource locator, or any domain becomes a technical

3  measure because you post that in or paste that into a

4  browser and you get access to a web page or content.

5  You get access to a video or content.  I'd say that

6  we shouldn't go that far.  So I would contend that

7  URLs or domain names or the streaming URLs here are

8  not a technological measure.  They're actually the

9  information that enables you to, just like a home

10  address or any web address that we're talking about,

11  have access to that information.  But, again, the

12  content, the work is already accessible.

13         Finally, going back to -- or going to

14  1201(b)(2)(B), similar language, technological

15  measure effectively protects the right of the

16  copyright owner under this title if the measure in

17  the ordinary course of its operations prevents,

18  restricts or otherwise limits the exercise of a right

19  of a copyright holder under this title, copyright

20  owner.  Again, the URLs don't do this.  In fact, just

21  the opposite.  These streaming URLs are the

22  information, are actually providing the access.

23  They're not preventing, restricting or otherwise

24  limiting.

25         But let's assume for a moment, arguably, that

```
 1    the URL is a technical measure.  Yout can't be
 2    circumventing that measure.  Looking back at
 3    1201(a)(3), to circumvent a technological measure
 4    means to descramble -- again, no -- decrypt -- again,
 5    no -- or otherwise to avoid, bypass, remove,
 6    deactivate or impair a technological measure without
 7    the authority of the copyright owner.  We're not
 8    doing that by using the streaming URL.  That is the
 9    information that we're actually using that provides
10    complete access.
11           And under 1201(b)(2)(A), to circumvent
12    protection afforded by a technological measure means
13    avoiding, bypassing, removing, deactivating or
14    otherwise impairing a technological measure.  If the
15    URL is the technological measure and we contend that,
16    Yout is merely using that as every browser does and
17    can't be a violation.  And as we've cited in our
18    brief, Egilman states that the statutes don't talk
19    about using a technological measure as violating the
20    statute.  And in Egilman, the court said, I don't
21    want to go there, we're not going to go there and put
22    that on.
23           To paraphrase Lexmark, it's not Yout that
24    permits access to the YouTube video or its content;
25    but it's actually the YouTube source code and Google
```

1    Chrome, among other browsers itself, that provide

2    that access.  If the RAA doesn't want their content

3    accessible, they can go to Google and say why is that

4    download button in the code, don't allow that to

5    occur.  But yet, it's there.

6         And although we maintain that, very clear,

7    there cannot be violations, to the extent that they

8    may disagree with my discussion of the technology, I

9    certainly disagree with their discussion of the

10   technology.  These are fact issues that require

11   discovery.  And if they then want to move for a

12   summary judgement, or we may do that, then that's the

13   time.

14        But here, I would argue, your Honor, that we

15   have sufficiently pled the elements to bring forth

16   this claim.

17        And just on the whether or not it's ripe,

18   because they argue that it's not, they're issuing

19   notices to third parties that have stated very

20   clearly that our client is violating the DMCA, and

21   this kind of bleeds into the 512(f) argument which

22   I'll hold off on.  But they clearly say that my

23   clients violated a federal statute.  And my client

24   has been harmed by those notices and the reaction to

25   those notices; and, consequently, there's no better

```
 1   place than to resolve this in federal court in this
 2   situation.
 3            So thank you, your Honor.
 4            THE COURT:  Thank you.
 5            Let me just ask, maybe ask both of you, about
 6   the concept of access that's been discussed.
 7   Obviously access to viewing a YouTube video of the
 8   type that Yout can convert and allow it to download,
 9   you know, the watching of a YouTube video, there's no
10   restriction on that access.  There does seem to be
11   restriction, however, on the ability to copy.  So I
12   was wondering --
13            MR. MUDD:  If I --
14            THE COURT:  Yeah.  I was wondering how the
15   statute treats the concept of access and whether it
16   can be kind of targeted under the statute just at
17   copying.
18            MR. MUDD:  Sure.  Two quick responses, your
19   Honor.
20            One is we would contend under the statute
21   that if the work is -- and the work is the sound
22   recording and these small niche number of videos that
23   might be applicable, and I point out that the RAA has
24   never identified any specific works at issue, so it's
25   hard to actually look at the code relating to those
```

1    YouTube videos.

2         But if the YouTube video is publicly

3    accessible, if the entire work is publicly

4    accessible, we would argue that under the statute,

5    the analysis ends there.  The work is already

6    publicly accessible.

7         Now, that being said, and assuming arguendo

8    that's too far, I don't believe it is.  But if that's

9    too far and we're talking about, all right, yes,

10   Mr. Mudd, the work is accessible, anybody can use or

11   see it on that YouTube page, but what about the

12   download and what about the sound recording or these

13   other files that might be on the server?  Well, my

14   response to that, your Honor, would be that, again, I

15   would point out that within the source code that you

16   or I could go and see, they are these streaming URLs

17   that all I have to do is post in another web browser

18   or another web page, rather, and change one number to

19   a zero and I'm able to download the entire file.  Not

20   only am I able to download it, but YouTube's software

21   shows that download button on the screen.  That's not

22   me adding that download button.  That's not somebody

23   else or a third party.  That's YouTube's software in

24   the source code for that page providing that download

25   button that it facilitates the download.  The same

1    for the sound recording.  You know, as I mentioned,

2    there are video streaming URLs and audio streaming

3    URLs.  They work exactly the same in that regard.

4           So I would argue that those streaming URLs

5    provide -- the access has already been provided to

6    the content.  And whether it's on the YouTube page,

7    watching it all or with this video or audio streaming

8    URLs, YouTube is providing that access to the content

9    without me using any third-party product whatever.

10   I'm using Google Chrome browser and YouTube's own web

11   page and the source code in it.  And I don't have to

12   manipulate the source code to get the download

13   button.  I was surprised when it actually appeared.

14   It was -- for my side, I think it's demonstrative

15   because nothing has to be done to get the download

16   button.

17          MS. EHLER:  Your Honor, if I could respond to

18   your specific question, the law actually answers this

19   question.  And I'll respond a little bit more broadly

20   to what Mr. Mudd argues as well.

21          The access provisions of the DMCA -- so the

22   DMCA was allowed to allow copyright owners to do

23   exactly what they're doing here, which is entering

24   into a relationship with a distributor like YouTube

25   where there is a technological protection measure.

1    And it is streaming, right?  You are able to watch

2    it.  But something that prevents the ordinary user

3    from gaining access to the copy of that work, the

4    underlying file still -- that is what Congress was

5    worried about was that file ending up all over the

6    Internet and effectively destroying the exclusive

7    right, because a perfect digital copy that exists can

8    be, as Yout does, ripped from the servers where it's

9    stored where it's not -- where an ordinary user like

10   you and I cannot access it.

11        And so that's -- the access control -- it's

12   not about -- you know, we talk about the work, the

13   work is accessible because you can watch it on --

14   again, that's not what's going on here.  That's not

15   what the statute is designed to prevent.  And *Corley*

16   says that.  *Reimerdes* and *Corley* say that.  The

17   defendants in that case made a -- I believe the word,

18   the decision to use is, sort of, a version of a

19   first-sale argument, that because you had a right,

20   you bought the DVD, right?  I have a copy of the D

21   VD, that somehow you have a right to the digital file

22   as opposed to just watching it on your DVD player.

23   And the Second Circuit rejected that.

24        The same is true here.  The fact I can watch

25   a video on YouTube, the fact that it's -- whether

1   it's Taylor Swift or Stevie Nicks, I don't get the

2   rights to get a copy of that.  I get the rights to

3   watch an advertisement that then compensates YouTube

4   and the record companies and the artists for my

5   ability to see that work.  It's not -- these artists

6   aren't putting their music out there to be, you know,

7   copied in infinity, right?  That's not what's going

8   on here.

9          And I -- to address Mr. Mudd's sort of much

10  broader and very lengthy explanation of his view of

11  what's going on, he is trying to make this a fact

12  issue.  It's not.  It's very, very simple.  If you or

13  I go to YouTube right now, you're not going to see

14  the button that Mr. Mudd is talking about.  I don't

15  know where that button is.  I have not seen it.  I

16  can view source code but I don't know how descramble

17  that source code.  I don't know how to decipher it.

18         I realize Mr. Mudd knows more about code than

19  I do; and perhaps, Judge, you know more than I do as

20  well.  But the standard, the legal standard is the

21  ordinary user.  When the ordinary user streams via

22  YouTube, they do not get a copy of that file.  What

23  Yout is doing or what Mr. Mudd is doing when he

24  changes numbers around and he has his seven steps or

25  his five steps, what he is doing is essentially

1    reversing that algorithm and those keys, overcoming,

2    avoiding, bypassing, whatever words you want to use,

3    deciphering, decrypting, but overcoming that

4    technological hurdle, which is absolutely an

5    information or process that YouTube has erected to

6    prevent you and I from doing that.  He's overcoming

7    it to gain access to the file on the servers that

8    enables the download.  It's really that simple.

9            And it doesn't matter if he can explain it to

10   you.  I'm sure that the team in Norway could explain

11   to you how to write the DeCSS code.  The fact that he

12   can explain it doesn't -- or that he can see it by

13   looking at the source code doesn't change what the

14   DMCA was intended, which is to create a barrier,

15   that -- it's about the function, that the function of

16   the technological protection measure is to prevent

17   you or I or to -- maybe not prevent, right, but an

18   obstacle in the informational process so that you and

19   I don't just get to grab that file.  It's not just

20   free.  And it's not.  And we know that because Yout

21   would not exist.  If it were so easy, there would not

22   be so many stream ripping services out there.  Yout

23   would not exist if YouTube made it that accessible.

24            MR. MUDD:  Could I respond, your Honor?

25            THE COURT:  Of course.

1          MR. MUDD:  For arguing that it's not a

2    factual issue, maybe the determination on whether

3    something is a technological measure or whether that

4    technological measure then circumvented, I would

5    argue, has factual elements.  There might be aspects

6    that are legal.  But there's a lot of factual

7    information being conveyed by both sides.

8    Particularly YouTube and Google is not here.  We

9    don't know what their intent was in providing the

10   streaming URL for the audio and the video.  It could

11   be bandwidth issues.  It could be something

12   completely different.  We don't have any evidence

13   before what the design for that was and so forth.

14          The other thing that I'd like to make a point

15   on is that we're not talking about descrambling

16   anything.  The DeCSS cases talked about encryption

17   and trying to get in and break the encryption so that

18   something else could read the actual content.  That's

19   not what we're talking about here.  I appreciate

20   counsel's --

21          THE COURT:  Well, it's arguably a different

22   form of protection.  But I guess the question is

23   whether it is an effective measure to restrict access

24   at least to the copies.

25          MR. MUDD:  And I would agree with your Honor

1    on the effective aspect, and that is part of the

2    statute.  And if it is a technological measure and

3    that is what it was designed to do, these URLs, it's

4    not effective because that is the information.  It's

5    not decoding or descrambling anything.

6         And I think that Rose with all -- you know,

7    she gives me too much credit.  But perhaps there

8    should be an evidentiary hearing where the Court can

9    see exactly what we're talking about and go through.

10   That might be an option.  But she's giving me too

11   much credit on the knowledge of technology.  Twenty

12   years ago, I may have agreed.  But my sons know much

13   more than I do about technology at this point in

14   time.

15        My point here is that the copyrighted work at

16   issue for the recording industry, it's the sound

17   recording that's in these files, is publicly

18   accessible.  I hear what they're saying and I hear

19   her argument that it's publicly accessible only,

20   let's say, in a streaming format.  But that's not

21   necessarily the case because YouTube's own code

22   provides the ability to obtain access to the entire

23   content.  It's not descrambling anything or

24   deciphering any code.  And, in fact, you know, there

25   are actually platforms, third-party platforms that

1    allow you to piece together different parts of music

2    that third -- that major companies are using.

3           But here, just focused on this, the

4    copyrighted content had been fully provided access

5    to.  Whether it's Yout or some other form of somebody

6    creating a personal copy, the entire work has been

7    provided access to.

8           And the final point I'd push back right now

9    is I would agree with -- you know, I've been dealing

10   with the recording industry on the other side for

11   many, many years.  And I completely agree that if

12   somebody takes a copy of a copyrighted work and

13   distributes that widely on the Internet or even

14   distributes a couple copies to people that haven't

15   paid for it or what have you, that is infringing the

16   copyright.  That's a completely different issue.  And

17   that kind of gets to the 512(f) issue.  But that's

18   not what we're talking about here.

19          We're talking about Yout being one form of a

20   mechanism that allows an individual -- using

21   information that is provided to the computer.  It's

22   not getting in the back end.  It's not breaking into

23   any computer.  It's not any unauthorized access.

24   That information has been conveyed to my browser on

25   my Internet and it's publicly available.  Not only

1    the work, the source codes are publicly available.

2    They've been provided to my computer, and it's merely

3    using that information to facilitate the download of

4    that work.  And behind the code, in that code,

5    YouTube is doing the same thing.

6         So I don't see how Yout can be violating the

7    DMCA for something that a browser -- and I appreciate

8    Rose mentioning paragraph 41 of our brief or our

9    complaint because that is all it is doing.  Yout is

10   merely doing what a browser can do itself.

11        MS. EHLER:  Your Honor, if I could mention --

12   I won't repeat myself, I promise.  But if I could

13   mention two additional points that are relevant to

14   cases Mr. Mudd cites that I think can help break us

15   out of this, you know, conversation a little bit.

16        But one of the cases that Mr. Mudd cited, I

17   think it was the health care case, involved a robot

18   TXT file.  And the court said in that case while that

19   -- there had been a blip in its operation, in that

20   case that would be sufficient to be an effective

21   technological protection measure.

22        The German decision that we cited is also

23   exactly on point.  And, you know, Mr. Mudd says what

24   does Google think.  Google said what it thought in

25   that case, and it was analyzing the same ruling set

 1    forth as here.

 2        And, you know, when we talk about using the

 3    technological measure, I can use anything, right?

 4    You know, you used the DVD with DeCSS.  That's just

 5    glossing over the details.

 6        The only case that Mr. Mudd cites, the

 7    *Egilman* case, that involved using was somebody

 8    literally typing a password into a username and

 9    password.  That's not what Yout does.  You don't --

10    you're not watching a YouTube via a YouTube player.

11    Yout is interposing its software instead of the

12    normal functioning of YouTube.

13        And so I just -- I'll stop because I won't

14    repeat myself, as we lawyers are known to do.  But

15    there really -- it's night and day, you know, from

16    what Mr. Mudd's describing.  This is so far on the

17    reasonable inference perspective that the motion to

18    dismiss can be granted based on, really, the obvious

19    conclusions from what happens when a normal person

20    watches YouTube, the allegation that Yout encounters

21    the signature mechanism, reads, interprets, derives,

22    and then the outcome, which is something that you

23    don't get otherwise which is a download.  And Yout

24    wouldn't exist.  If it weren't effective and everyone

25    could do it, Yout wouldn't exist.

```
 1            THE COURT:  So let me just ask you to focus a
 2   little bit on the circumvention point.
 3            MS. EHLER:  Yes.
 4            THE COURT:  The language of the statute is,
 5   in pertinent part, descramble a scrambled work; I
 6   don't understand that to be happening.  Decrypt an
 7   encrypted work; I don't understand that to be
 8   happening.  Or otherwise avoid, bypass, remove,
 9   deactivate or impair a technological measure.
10            So which of those is Yout doing and how?
11            MS. EHLER:  Sure.  I think it could be any
12   number of those, and I also think that the word
13   "otherwise" is relevant.  Right?  This statute was
14   passed in 1998.  YouTube didn't exist.  Yout didn't
15   exist.  So, you know, maybe they would have said
16   "decipher" then if Congress had had this before them.
17   But decrypt covers what's going on here.  Avoiding
18   and bypassing also does too and I'll explain why.
19            The YouTube player, what Mr. Mudd is
20   describing, and I do -- you know, I'm getting into
21   facts to answer your question.  But I think this is
22   enough.  I think we can get there from the complaint
23   as well.
24            But the YouTube player is engaging with the
25   YouTube website behind the scenes.  Right?  There's
```

1    code that is authenticating the fact that that's a

2    legitimate player; and because it's legitimate,

3    because the YouTube player we use to watch our video

4    or listen to our music is legitimate, the code is

5    giving -- it's deciphering that code and giving me

6    access to where the files are stored.  That's the

7    mechanism, right, that it's giving access.

8         What Yout does is it just kind of like, you

9    know, pops in there, pretends to be the video player,

10   right?  It has deciphered, it has decrypted the

11   algorithm and overcomes that technological obstacle,

12   it avoids it, bypasses it, I think any of those words

13   work here, to get to the same file.

14        And so, you know, regardless of, sort of,

15   which of the words you pick, I mean, decrypt may be

16   the most accurate because here it is -- it's the kind

17   of encryption technology.  It's a scramble.  It's

18   something that you have to change numbers and you

19   need a code to get the key, right?  That decryption

20   or avoiding and bypassing and what the Yout software

21   is doing to gain access to it.  It's essentially, you

22   know, imitating or, sort of, counterfeiting and

23   pretending that it is the authorized YouTube player.

24   That's not so different than what DeCSS did too,

25   right?  It worked backwards, figured out what the

1    algorithm was, figured out authorized keys -- and

2    this is the *Real Networks* case as well.  Using

3    authorized keys -- you don't have to sledgehammer a

4    technological protection measure to circumvent.

5    Using authorized keys because you obtained them

6    without the authority of the copyright owner by

7    reversing the algorithm, that's circumvention too.

8    And that's the *Real Networks* case and the *Corley*

9    case.  That's what the cases say.

10             MR. MUDD:  Could I respond, your Honor?

11             THE COURT:  Sure.

12             MR. MUDD:  Not at all what actually is

13    occurring.  There is no decryption.  There is no

14    descrambling.  These URLs, the streaming URLs, the

15    only number that's changed is the -- it's not any

16    brilliant rocket science or any effort.  The numbers

17    that are changed are the particular points in time,

18    the length at the particular YouTube video that's

19    being shown for one of those streaming URLs.  So if

20    you change a zero to be the beginning point, and

21    let's say you have 9,999,000 to the end point, that's

22    all that you're doing.  It's not decrypting.  It's

23    not descrambling.  That's the example that I was

24    using with respect to copying the URL that's provided

25    on the source code, pasting it into another web page

1    and the video pops up.  There is nothing more to it.

2    That entire URL, that entire sequence is given to the

3    source code.  It's given to the browser.  We're

4    not --

5          And authenticating YouTube -- you know,

6    authenticating the YouTube player, I mean, with all

7    due respect to opposing counsel, she's making more of

8    what's going on than actually happens to be.  This is

9    not an Atari where you needed a coded cartridge to be

10    able to play.  This is not a DVD that requires DeCSS

11    technology -- or not the DeCSS, the CSS content

12    scrambling technology to be able to show that, yes,

13    this is a legitimate player.

14          What we're talking about primarily is the

15    actual YouTube player on the phone has a download

16    button.  What we're talking about is when you go on

17    your browser, it's not authenticating whether I'm a

18    legitimate browser or I'm a legitimate user or not.

19    It's I'm going to the youtube.com and I'm playing a

20    video and it's connecting to that video, and it

21    provides that information to my computer.  There is

22    no authentication to determine whether I'm real,

23    valid or authorized or anything of that nature.

24          And I think that we're imposing a lot of

25    intent and knowledge and objective under what

1   YouTube's code was designed to do and what actually
2   YouTube is doing.  And so, again, because so much of
3   that with counsel talking about, erroneously, I would
4   argue, what YouTube  is doing and authenticating with
5   this software and what my client's software is
6   actually doing, not decrypting, not descrambling,
7   it's taking information that's being provided, I do
8   think that there are factual issues.  Because I don't
9   represent Google, I don't think that Ms. Ehler
10  represents Google, and we really can't speak to what
11  their intent was behind these URLs, behind what goes
12  on.
13          But authentication, no, this is not similar
14  to those other cases that the defendant cites.
15          THE COURT:  Okay.  Well, I'll swing back to
16  this, the issue, maybe at the end with some thoughts.
17          But let's move on to the 512 issue.
18          MS. EHLER:  Thank you, your Honor.
19          And just to close that out, I do think that
20  if Mr. Mudd is right and there are more facts, you
21  know, it's just applying law to those facts, pleading
22  those, other than one paragraph that says "read,
23  interprets, derives a signature value," we actually
24  know what is going on behind the scenes, I think I
25  can then again come back and explain to you how that

1    meets the legal definitions of circumventing in a

2    technological protection measure.

3         But on 512(f), so this independently --

4    obviously, this rises and falls with the 1201 claim

5    as well.  Right?  If there's no misrepresentation,

6    then that's the end of it.  But independent from

7    that, 512(f), the statute, requires a

8    misrepresentation regarding the material or activity

9    that's infringing.  And Mr. Mudd has said a number of

10   times just in his argument that this isn't about

11   infringement.  The notices weren't about

12   infringement.  They're circumvention notices.

13   Paragraphs 30, 34, 36 all say they're circumvention

14   notices.  They all talk about circumvention.  Google

15   has a separate, you know, kind of -- it's not a DMCA

16   takedown (c)(3)(A) notice.  It's a circumvention

17   notice portal that they were submitted through.

18   That's what they are.  And 512(f) just does not apply

19   to that.  And the cases that we've cited are two New

20   York cases and one Ninth Circuit case that all say

21   that.  So a misrepresentation, an alleged

22   misrepresentation regarding something else is just

23   not covered here.

24         So independently of 1201, that claim fails.

25         And then the second argument is, you know,

1    this debate, right, there's no knowledge of falsity.

2    Clearly the international decisions establish that

3    there is a basis for these stream ripping services

4    being illegal.  They are.  It's obvious that they

5    are.  And so the knowledge of a misrepresentation is

6    also lacking.  So those are two elements that are

7    clearly lacking.

8            I'll stop there because I think that's an

9    easy one.

10           THE COURT:  All right.  Thank you.

11           MR. MUDD:  Thank you.

12           I'd first like to again mention that there

13   has been a lot of talk and citation to legal opinions

14   and a faxed attachment from Germany which I -- the

15   page order of that was a bit confusing.  But those

16   are talking about different statutes than we have in

17   the United States, and I want that -- for us all to

18   keep that clear.  I'm sure your Honor will.  And I'm

19   happy to brief those foreign cases.  But, again, they

20   are foreign cases and they're not addressing U.S.

21   law.

22           As to 512(f), I agree that 512(f) is talking

23   about false representations of infringement.  It does

24   not talk about false representations relating to

25   circumventing the technology.

1          But that being said, I don't believe that the

2     RAA can get away from the obvious inference and

3     interrelationship of the statutes and what they

4     alleged in their notices.  The circumvention statute

5     requires a copyrighted work, so inherently there has

6     to be a copyrighted work for there to be a violation

7     of the anti-circumvention statute.

8          Certainly I contend that they have alleged

9     infringement, particularly contributory infringement,

10    in not so many words.  Their notices say, quote,

11    that, you know, the -- or not quote yet, that Yout

12    has violated the anti-circumvention statute, the

13    DMCA, by getting around measures that are designed

14    to, quote, protect our member's works on YouTube from

15    unauthorized copying and downloading.  Well, what is

16    unauthorized copy and downloading but infringement.

17    That's what the RAA has been fighting for almost two

18    decades since 2003-4, with downloading of song

19    recordings on the Internet.

20         And I appreciate their effort to control.  I

21    represent artists.  I appreciate their effort to

22    protect the interests of copyright owners,

23    particularly the artists, not so much the record

24    companies.  But I get it.

25         But I think that they're making a distinction

```
1   without a real import there when they're talking

2   about that my client, Yout, violates the DMCA

3   essentially by allowing individuals to engage in

4   unauthorized copying and downloading of their

5   member's works on YouTube, that is saying that my

6   client is facilitating the infringement of their

7   copyrights.

8           And so I would argue that they did not use

9   the word 512(f), got it, but I think that the intent

10  and the import is there.  I agree that 512(f) does

11  talk about false representations relating to

12  infringement, absolutely.  But we believe based on

13  the statements in the notices and the Internet

14  connectedness, that there definitely is a violation

15  and a misrepresentation here.  And clearly that then

16  does depend on the factual issue of whether or not

17  there actually has been a violation of the DMCA or

18  here facilitating copyright infringement, because

19  we're not doing that.  I mean, it's certainly

20  possible that somebody can make a copy and distribute

21  it and infringe their sound recordings, but what we

22  are not doing is engaging in contributory

23  infringement.

24          Thank you, your Honor.

25          THE COURT:  Assuming I agree with you, what
```

1    does 512(f) get you that your defamation claims

2    don't?

3          MR. MUDD:  I believe 512(f) provides for

4    attorney's fees that the defamation claim does not.

5          THE COURT:  Okay.  All right.  Should we take

6    up the defamation claims?

7          MS. EHLER:  Your Honor, I was just going to

8    point out that it's not in the complaint.  Mr. Mudd's

9    explanation is, you know, to the extent responsive,

10   which I think it failed of its own on what's actually

11   in those notices with the circumvention notices, you

12   know, there's no allegation in the complaint that

13   they're about infringing material or content.

14         The defamation claims -- you know, your

15   Honor, I'm not going to sort of beat a dead horse.

16   But they do relate to the 1201 claims.

17         THE COURT:  Sure.

18         MS. EHLER:  And, you know, I think it's a

19   little bit of a stretch to talk about an

20   anti-circumvention notice to goodwill as having the

21   same reach as defamation.  But, really, we don't

22   think there's anything false or defamatory going on

23   here because Yout's service is circumvention

24   technology.  And so I think that it really rises and

25   falls with that.  There is certainly no falsity

1    there, no intention of misrepresenting there.

2         THE COURT:  Okay.

3         MR. MUDD:  On that point, the -- I'd focus on

4    their two aspects of their statements in the notices.

5    They contend that to our knowledge, so they talk

6    about they have the knowledge Yout is violating a

7    federal statute that provides it's not only a federal

8    statute but provides criminal penalties.  And

9    consequently, we argue that those statements are

10   false; and to the extent they are false, they're

11   defamation and defamation per se.  And -- but let me

12   parse out the two aspects.

13        So one is that they -- to our knowledge, Yout

14   violates the federal statute.  So if they have the

15   knowledge and they are making a misrepresentation

16   that Yout is violating the statute when it's not, as

17   our contention happens to be, then that is a false

18   statement.

19        On the other hand, if they don't actually

20   have sufficient knowledge to make a determination one

21   way or the other, by suggesting that they do have

22   that knowledge and the Yout is violating the DMC,

23   we'd also argue that that is a false statement that

24   the people are relying, and the gist of that all is

25   that our client is violating federal statute.  So

1    whether it's the fact that they don't have the

2    knowledge or not, both parts of that may be -- we

3    definitely contend that the allegations that we're

4    violating a federal statute to be false.

5         And as to the knowledge of what's going on in

6    their mind, that we don't have access to, that would

7    obviously be in their knowledge.  But clearly they

8    don't have sufficient knowledge because we argue that

9    Yout is not violating the statute, if that makes

10   sense.

11        Thank you, your Honor.

12        THE COURT:  Okay.  Thank you.

13        So let me make some observations.  The, kind

14   of, heart of the complaint, if you will, I think, is

15   found in paragraphs 37 through 43 which are somewhat

16   simplistic or top executive summary-type paragraphs.

17   The argument today has gone into much, much more

18   detail about the technology, how it works, whether it

19   is or is not, you know, unavailable to the ordinary

20   user, et cetera.

21        And I'm thinking that the complaint probably

22   should be resubmitted with greater detail.  That

23   would permit a more meaningful determination of the

24   motion to dismiss.  Right now the motion to dismiss

25   is, essentially, am I going to say that this fails

 1    the plausibility because it's too lacking in detail

 2    or not.  And it seems to me that the better approach

 3    may well be to get greater detail.  One way to do it

 4    is amend the complaint.  Another way to do it is see

 5    if there are factual stipulations that the two

 6    parties can reach and, you know, agree to allow me to

 7    consider those stipulations.  Another way to do it is

 8    perhaps limited expedited discovery to flesh it all

 9    out and make a summary judgement motion.

10         But I think probably the place to start is by

11    getting a more detailed complaint because, I mean,

12    quite frankly, both of you kind of wandered well,

13    well beyond the complaint in your arguments.  And,

14    frankly, in our research preparing it, we have too,

15    you know.  So it's a little bit awkward now to say

16    that we're ruling on whether this complaint suffices

17    or not.

18         What are your reactions to the suggestion

19    either to allow an amended complaint or to follow one

20    of those other options?

21         MR. MUDD:  Your Honor, I think that you --

22    you know, we'd be open to any of the options.  But

23    perhaps probably the simplest and the most

24    cost-effective before people spend money on expedited

25    discovery would be to amend the complaint.  And I'd

```
 1   be happy to work with Ms. Ehler to see if it is
 2   possible that we can stipulate to -- I know there are
 3   going to be a lot of things that we can't stipulate
 4   to, but to see if there are some that we can narrow
 5   down.  I'd be happy to take that approach.
 6            THE COURT:  Ms. Ehler.
 7            MS. EHLER:  Your Honor, yeah, an amended
 8   complaint also seems right to me.  Like I said, I
 9   think I can then explain to you with -- you know,
10   without going outside of the complaint why I think it
11   still meets the standard.  I think I have it on
12   paragraph 41.  But without some of the -- with less
13   of the common sense and more of the here's what they
14   say, here's what it means.
15            I also, frankly, think that the international
16   decisions are relevant.
17            And so, you know, if we're going to -- I
18   don't know that we're going to be back before you on
19   a motion to dismiss.  I'll certainly look and talk to
20   Mr. Mudd.  But I think it's worthwhile in your
21   consideration -- Mr. Mudd has his opinions on, you
22   know, the law at issue, you know, whether it's
23   collateral estoppel or not.  But, you know, I think
24   there's a robust motion that we can get you that will
25   help you decide these issues, like Mr. Mudd said,
```

1    without getting into any costly discovery.

2         THE COURT:  All right.  Mr. Mudd, how much

3    time do you need to file an amended complaint?

4         MR. MUDD:  If I could ask for 28 days, and

5    then that will allow -- and, Rose, if that's time for

6    you and I to kind of talk and see if there is any

7    meeting of the minds on what might be stipulated.

8    But if that works for both of you, that's fine for

9    us.

10        THE COURT:  That's fine with me.  Is that

11   appropriate?

12        MS. EHLER:  Fine with me.

13        THE COURT:  All right.  Very well.  Yeah.

14        And then if there is another motion to

15   dismiss, we can talk about whether to rely on the

16   current briefs, which can be supplemented, or whether

17   you want to start all over again and so forth.  I

18   don't want anybody to unnecessarily duplicate work.

19   I just don't think the complaint is currently in a

20   position to really make a meaningful decision.

21        So in sum, I'm going to -- I think I'll grant

22   the motion to dismiss without prejudice to filing an

23   amend complaint.  Does that sound fair?

24        MS. EHLER:  Yes, your Honor.

25        MR. MUDD:  That's fine, your Honor.

1          THE COURT:  All right.  Great.  Well, this is

2     very interesting stuff.

3          MR. MUDD:  Although one technical issue.  I'm

4     sorry to interrupt.  If you do grant the motion to

5     dismiss in that context, wouldn't then, with the

6     amended complaint, there need to be rebriefing as

7     opposed to putting a stay in on that and then having

8     us determine whether we want to maintain the same

9     briefs or supplement?

10          THE COURT:  Yeah.  I don't think there has to

11     be rebriefing.  You could always file a one page that

12     says we incorporate by reference the --

13          MR. MUDD:  Okay.

14          THE COURT:  Yeah.  That's fine.

15          MS. EHLER:  I have a feeling I may want to

16     rebrief it, your Honor, or I have a feeling my motion

17     may want.

18          THE COURT:  To a certain extent it will be

19     helpful because now the paragraph references will be

20     different and so forth, so it may be cleaner to do

21     that way.  Feel free to cut and paste from your --

22     both of you from the current briefs if that's

23     helpful.

24          All right.  Well, as I said, this is very

25     interesting.  I appreciate the argument and I look

1    forward to seeing the amended complaint and any

2    motion that might be directed to it.

3           MR. MUDD:  Thank you, your Honor.

4           MS. EHLER:  Thank you, your Honor.

5           THE COURT:  Thank you both.  Take care.

6    We'll stand in recess.

7           (Proceedings concluded, 5:06 p.m.)

8

9                C E R T I F I C A T E

10

11   RE: YOUT LLC v. RECORDING INDUSTRY ASSOCIATION OF
                    AMERICA, INC. ET AL.
12                  No. 3:20-cv-01602-SRU

13

14          I hereby certify that the within and

15   foregoing is a true and accurate transcript taken in

16   the aforementioned matter to the best of my skill and

17   ability.

18

19          /s/_Melissa J. Cianciullo_____

20       MELISSA J. CIANCIULLO, RDR, CRR, CRC
                Official Court Reporter
21           United States District Court
               915 Lafayette Boulevard
22              Bridgeport, CT 06604
                  (203) 606-1794

23

24

25